### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| HANY SHALABI, | |
| Plaintiff, | No. 21 CV 5623 |
| v. | Judge Manish S. Shah |
| CITY OF CHICAGO, a municipal corporation, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

Hany Shalabi, who identifies as Palestinian-American and Muslim, applied to become a Chicago Police Officer in 2015. He completed the initial steps of the application process, including the background investigation, but then his application stalled. In November 2021, after filing this suit, he received a letter stating that his application was preliminarily ineligible due to criminal conduct and asking if he wanted to continue with his application; he voluntarily withdrew his application. Because the City's eligibility determination was based on a legitimate, non-discriminatory reason not to hire Shalabi, judgment as a matter of law is appropriate for the City on Shalabi's claims of discrimination and retaliation.

## I.    Legal Standards

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Material facts' are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Museke*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment is also appropriate when "a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"On summary judgment the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Adickes v S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). The court does not, however, make credibility determinations, weigh the evidence, or decide which inferences to make from the facts; those are jury functions. *Anderson*, 477 U.S. at 255.

## II.    Motion to Strike

Shalabi filed a motion to strike two declarations attached to the City's response to his statement of facts. [73]. Shalabi argues that the City failed to disclose Kenneth Coats, the CEO of Kentech Consulting, and Robert A. Flores, a sergeant in CPD's Office of Legal Affairs, in its Rule 26 disclosures and discovery responses. Because of the City's failure to disclose these individuals as people who may have relevant information or could serve as witnesses, Shalabi argues that he was deprived of the opportunity to depose them or prepare evidence to rebut the declarant's statements.

If a party fails to provide information required by Fed. R. Civ. P. 26(a) or (e), the party may not use that information on a motion, at a hearing, or at trial, "unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). The

sanction for failure to disclose is "automatic and mandatory" unless the sanctioned party can show justification or lack of harm. *Chicago Joe's Tea Room, LLC v. Village of Broadview*, 94 F.4th 588, 603 (7th Cir. 2024).

The City does not dispute that it failed to identify Coats or Flores in its discovery disclosures or responses. Instead, the City argues that its failure to identify the two was harmless. As to Coats, the City states that he is the custodian of records that were disclosed to Shalabi, and that Shalabi knew Kentech conducted his background investigation and declined to depose anyone from Kentech. Coats's declaration goes beyond providing a foundation for the records, however, because he describes how Kentech conducts Terrorist Watch Searches for applicants. [71-2] ¶¶ 3, 8–9. The City's failure to disclose Coats prevented Shalabi from the opportunity to question him about the nature of the Terrorist Watch Search, whether the search always used the same databases, and any changes over time in the nature of the search. As such, I decline to find that it was harmless, and I strike Coats's declaration, [71-2], and disregard argument that relies on it.

The City argues that Shalabi knew of Flores because Flores signed the EEOC response that had been produced to Shalabi in discovery. I agree that the failure to disclose Flores was harmless because Shalabi had knowledge of Flores's role in the creation of the position statement and he could have chosen to depose Flores to find out why the City's position statement contained what he believed to be a discrepancy. Furthermore, Flores's declaration does not establish an undisputed fact, and therefore does not prejudice Shalabi at summary judgment.

Shalabi's motion to strike, [73], is granted as to Coats and denied as to Flores.

## III.  Facts

Plaintiff Shalabi identifies as Arab of Palestinian origin and Muslim. [61] ¶ 1.[1]
In 2006, when Shalabi was 19 years old, he was arrested for disorderly conduct. [71]
¶ 2. He was working as night manager at an IHOP and took $5,000 home in order to
deposit it in the bank. [61] ¶ 25; [59-3] at 44:3–15. The next day, Shalabi staged a
break-in to his car by throwing a brick through the window and reported to the police
that the money had been stolen. [61] ¶ 25; [59-3] at 45:2–46:9. Police officers came to
the scene and took a report; Shalabi later went to the police station to review mug
shots. [61] ¶ 26. At the station, Shalabi told detectives that he was working out when
his car was broken into, but detectives confronted him with records from the gym
showing that Shalabi had only been working out for 10 seconds. [61] ¶ 27. Shalabi
was arrested after he confessed to keeping the money and staging the break-in. *Id.*

Shalabi was charged with disorderly conduct for making a false report to the
police. [61] ¶ 28. On October 20, 2006, the charge against Shalabi was stricken with
leave to reinstate. [61] ¶ 28; [59-5] at 72. Shalabi testified that he was issued 40 hours

---

[1] Bracketed entries refer to entries on the district court docket. Referenced page numbers are
taken from CM/ECF header placed at the top of filings, except in the case of citations to
depositions, which use the deposition transcript's original page numbers. Facts are taken
from the parties' response to Local Rule 56.1 statements of facts, [61] and [71], where both
the asserted fact and response are set forth in one document. Under Local Rule 56.1(e)(2) I
ignore non-responsive additional facts raised in a response. *See* [61] ¶¶ 17, 20, 28, 42. The
parties' objections to the following statements are overruled and the facts deemed admitted:
[61] ¶¶ 10, 12, 16, 18, 22, 27, 36, 39, 66. The parties quibble and haggle over other statements
of fact, and in those instances, I looked to the cited materials to glean what was material and
undisputed: [61] ¶¶ 9, 11, 15, 23, 25, 28, 33, 37, 41–42, 57, 61, 65; [71] ¶¶ 1, 3–4, 7, 10–12,
29–31, 34–37. The following statements were irrelevant or duplicative: [61] ¶¶ 2–4, 6, 8, 34,
46, 50–56, 58–60, 62–63, 67, 68.

of community service, but he did not know whether the charge would be reinstated if he did not complete the community service. [59-3] at 49:3–19; [61] ¶ 28. Shalabi's record of an arrest for disorderly conduct was expunged in 2019. [61] ¶ 57. Shalabi's previous employers, including the IHOP manger, consider him eligible for rehire. [71] ¶ 37.

Shalabi married Nilofer Nanlawala in 2011; she is Asian, her national origin is Indian, and she is Muslim. [61] ¶ 64. Shalabi and Nanlawala have three children together. *Id*.

Nanlawala became a Chicago Police Officer in 2015; while she was undergoing training at the police academy, she became pregnant with her second child. [61] ¶ 65; [71] ¶¶ 14, 16. Nanlawala asked for an accommodation to work light duty; that request was not initially granted. [71] ¶ 16. Nanlawala went out on maternity leave in 2016. [61] ¶ 66. When Nanlawala was assigned to District 14, she asked for a room in which to pump breast milk but ended up having to pump in a bathroom during her 15-minute breaks. [59-13] at 30:15–24; [71] ¶ 19. Nanlawala told the watch secretary that 15 minutes was not enough time to undress, pump, and put her equipment back on, but did not receive more time. *Id*. Nanlawala testified that after she made accommodation requests, she experienced mistreatment and harassment by her supervisors; she filed a charge with the EEOC and a federal lawsuit alleging gender, race, sex, and national origin discrimination and retaliation. [71] ¶¶ 15–23.[2]

---

[2] I make no factual findings as to the truth of Nanlawala's allegations of harassment and mistreatment. The City does not dispute that Nanlawala made requests for pregnancy and pumping accommodations. *See* [71] ¶¶ 16, 18–19; [61] ¶¶ 65–66.

Nanlawala spoke about her family life at work, including the fact that her husband was of Palestinian national origin and applying to be a Chicago Police Officer. [61] ¶¶ 69–70.

The Chicago Police Department's Department of Human Resources reviews and decides on requests for accommodations, medical leave, transfers, behavioral interventions, and other personnel concerns. [71] ¶ 5. In the spring of 2017, the Director of CPD's Department of Human Resources, Robert Landowski, was sent two memoranda about extending Nanlawala's probationary period. [61] ¶ 71.[3] Landowski testified that he had interactions with the District 14 Commander and that he worked with district commanders on personnel issues that may have come up in the commander's district. [71] ¶ 4.

### A.   City of Chicago Police Hiring Process

The City says there were five steps in hiring a Probationary Police Officer: (1) written exam, (2) pre-Police Officer Wellness Evaluation Report test, (3) drug screen, (4) background investigation, and (5) a final POWER test. [61] ¶ 7. Shalabi asserts there was a pre-screening application to determine eligibility before the first written exam. *Id*. After the final POWER test, candidates had a psychological and medical assessment. *Id*.

The City's Department of Human Resources administered the written exam; applicants who passed were placed on a list of applicants eligible for further

---

[3] Landowski was the Director of the Chicago Police Department's Department of Human Resources from May 2017 until December 2020. [59-7] ¶ 1.

application processing. [61] ¶ 9. The City's Department of Human Resources sorted the eligibility list into order based on a lottery; as vacancies became available, the City's Department of Human resources referred applicants in lottery order to the Chicago Police Department's Human Resources, Investigations Section, which conducted the rest of the review process. [61] ¶¶ 9–10.

CPD's Investigations Section administered the pre-POWER exam and those who passed were subjected to a background investigation, which included fingerprinting, drug testing, completion of a Personal History Questionnaire, home interview, and a polygraph examination. [61] ¶ 11; [71] ¶ 6. The background investigation included the interview, verification of information in the questionnaire, and review of law enforcement and driving records, credit report, and court records. [61] ¶ 13. An internal CPD investigator or an outside vendor, Kentech Consulting, completed the background investigation. [61] ¶ 14. The parties dispute whether the investigator recommended that the applicant pass or fail. The City says the investigator was neutral, but Shalabi points out that the Kentech report noted red-flags from the investigation and Landowski testified that investigators "can review these standards and make a determination as far as whether they're going to – could write someone up as a rejection versus an approval." [59-14] at 118:10–15; [61] ¶ 14. The investigator turned the completed file over to the Investigations Section. [61] ¶ 14.

Within the Investigations Section, a supervisor performed a preliminary review; if the supervisor rejected the application, the application was sent back to the

investigator to complete a "Summary Report." [61] ¶ 15.[4] The Summary Report was sent to the supervisor and then to the Director of Human Resources for a final determination. [61] ¶ 16. Landowski testified that he reviewed rejected files and sent notes stating his reasons for the rejection or asking for further investigation on an issue. [59-14] at 62:22–63:16; [61] ¶ 16. If the application was ultimately rejected, the applicant was notified and told of the appeal procedures. [61] ¶ 16.

A City of Chicago Human Resources recruiter said that it took anywhere from 18 to 36 months from the time she sent an application for the background check until she received notice to onboard a new hire. [71] ¶ 7. A former member of the Investigations Section testified that a background investigation could take as little as a week and "an actual ground-up [investigation] probably never took more than a year to complete. But after the determination, if it didn't meet the background standards and … it was put into a pending status … it's not the actual background investigation." [62-2] at 56:16–19, 57:3–9. [71] ¶ 8. Most of the time the City communicated with a candidate through the "Recruit" system. [71] ¶ 12.

The standards for disqualification of an applicant were set forth in the Chicago Police Department's Bureau of Support Special Order No. 1601, "Pre-Employment Disqualification Standards for Applicants for the Position of Police Officer," also referred to as the "Background Standards." [61] ¶ 12. The Standards stated that

---

[4] Applications that were preliminarily approved were also sent to the investigator for a Summary Report, which was sent to the supervisor and Director of Human Resources. [59-7] ¶ 14. If the supervisor and Director approved, then the applicant would proceed to the final POWER exam. [59-7] ¶ 14; [59-14] at 62:11–15.

various types of criminal conduct can disqualify an applicant, as well as a poor driving record, prior employment history, military history, association with criminal organizations, indebtedness, and other conduct. *Id.* A CPD investigator testified that when considering acts of dishonesty, "We have built into our standards … indiscretions throughout a life. Everybody was young. No one's perfect." [59-8] at 49:2–7; [71] ¶ 3. He further testified that he did not look at dishonest acts in "grammar school or high school, things of that nature, unless it's substantial" and that "you have to take it on a case by case basis." [59-8] at 49:22–50:2; [71] ¶ 3.

### B.    Shalabi's Application

Shalabi applied to be a police officer on November 11, 2015, and as of July 2016, he had completed all of the initial requirements. [61] ¶¶ 17–18.[5] Shalabi was assigned a random lottery number that placed him in the sixth batch of 2016 applicants to be referred to CPD's Investigations Section. [61] ¶¶ 18, 10.

In May 2017, Shalabi completed a personal history questionnaire; he disclosed that his driver's license had been revoked for speeding tickets and that he had used marijuana four times in 2006. [61] ¶¶ 19, 21. Shalabi answered "yes" to the question "have you ever been convicted of a crime and/or entered a plea of guilty to a crime"; he wrote, "I was convicted of a misdemeanor of July 2006 of Disorderly Conduct. I broke the window to my car then called the police and told them that someone broke into my car. Judge issued 40 hours community service." [61] ¶ 20. Shalabi gave the

---

[5] Shalabi had previously applied to the CPD and went through the background investigation but was not hired. [71] ¶ 1.

same answer to questions about whether he had ever appeared in court on a criminal matter or for any reason. [61] ¶¶ 20–21. Shalabi also disclosed that he was married to Nilofer Nanlawala, a CPD police officer. [61] ¶ 21.

### 1. *Background Investigation and Kentech Report*

In June 2017, Kentech began Shalabi's background investigation with an in-person interview. [61] ¶ 22. During the interview Shalabi was asked about interactions with the police and he mentioned a 2005 incident where his cousin's car caught fire and the police were contacted. [61] ¶ 23. Shalabi also discussed the disorderly conduct incident. [59-3] at 43:3–5; [61] ¶ 23. He told the investigator that he had been arrested because he took $5,000 from his employer and instead of depositing the money, he staged a break in of his car and reported the $5,000 missing. [61] ¶¶ 25–26. Shalabi also told the investigator about his speeding tickets, car crash, and use of marijuana. [61] ¶¶ 29–31. Shalabi recalled discussing his Middle Eastern heritage. [61] ¶ 23. He told the Kentech investigator that his wife worked for the CPD; his wife was interviewed as part of the background investigation. [61] ¶ 24.

The Kentech Summary Report, dated July 6, 2017, noted the following red flags from Shalabi's background investigation: (a) suspended driving license due to driving citations; (b) disorderly conduct conviction in 2006; (c) receipt of seven traffic citations from 2003 to 2011; (d) use of marijuana four times in 2006. [61] ¶ 32.[6]

---

[6] Kentech's 2012 Investigative Report indicated that Shalabi had lived in Palestine for six years and the investigator completed a "Terrorist Watch Search" for Shalabi that searched 73 databases, including the Palestinian Legislative Council List, Politically Exposed Persons List, US Dept. of State's Foreign Terrorist and Terrorist Exclusion Lists, Immigration and Customs Enforcement – Most Wanted, MIPT Terrorism Knowledge Base, Office of Foreign

Shalabi took a polygraph exam on February 10, 2018. [61] ¶ 35. In the pre-polygraph questionnaire, Shalabi answered yes to questions about whether he had been arrested, had planned a burglary to an auto, and had committed theft from a workplace; Shalabi provided an explanation to each question stating that he had staged a break-in of his own car, reported to the police that $5,000 had been stolen from his car, and that it was done to get the money from his insurer. [61] ¶ 36. Shalabi also listed that he had engaged in underage drinking, speeding, texting and driving, parking illegally and disclosed that he had used marijuana "five or six times" in July 2006. [61] ¶ 37. In the additional information section of the questionnaire, Shalabi provided a narrative account of the 2006 theft, including that he confessed to the behavior and returned the money. [61] ¶ 38. Usually, the polygraph test was administered after the background investigation. *See* [71] ¶ 13.

### 2. *Processing of Shalabi's Application*

In 2019, CPD Officer Dwayne Bragiel was assigned to process Shalabi's file as part of an initiative to clear the backlog of 2016 applications. [61] ¶ 39. Shalabi's background investigation had not been completed when Bragiel received his file. *Id*. In July 2019, Bragiel emailed Shalabi to ask if he was interested in continuing his application; Shalabi responded that he was. [61] ¶ 40. On August 31, 2019, Shalabi emailed Bragiel to follow up on his application, shared the names of his character

Assets Control – Specially Designated Nationals List, United Nations Consolidated Sanctions List, World Bank Listing of Ineligible Individuals, and the Australia Sex Offender Registry. [71] ¶ 10. Kentech's 2017 Investigative Report stated that Shalabi had previously applied to the CPD and Kentech conducted a background investigation, file number 37095, as part of that application. [71] ¶ 11.

references, and wrote, "Both will speak to my character and hopefully this will show that whatever is in my past is not a reflection of who I am now." [61] ¶ 41. Shalabi also shared that his wife was a Chicago Police Officer. *Id*.

Bragiel responded in September 2019 saying, "I haven't forgotten about you. You're in line." [61] ¶ 42. In June 2020, Shalabi emailed Bragiel again to follow up on the application but did not receive a response. *Id*. The initiative had ended, and Bragiel was no longer working on Shalabi's application; the 2019 initiative was not the only initiative allocated to catch up on backlogged cases. *Id*.; [71] ¶ 9.

Neither party submits evidence about what happened to Shalabi's application after 2019. When asked if Kentech or the CPD followed up to address the red-flags indicated in Shalabi's report, Landowski testified that he "believe[ed] this was based on a preliminary review of this file. And he was set aside in those preliminary reviews as a potential rejection." [59-15] at 198:4–9; [61] ¶ 33.

In November 2021, CPD emailed Shalabi a letter stating that CPD made a preliminary determination that he was not eligible for the probationary police officer position because of criminal conduct, conduct involving drugs and driving, and employment history. [61] ¶ 43. The letter gave Shalabi twenty-one days to notify CPD that he wished to continue with the application process, in which case CPD would investigate the facts and circumstances around Shalabi's disqualifying incidents. *Id*. The letter stated "If, at the expiration of the 21 day period, you fail to notify CPD in writing of your desire to continue with the application process, you will be deemed to

have voluntarily withdrawn your application and your name will be removed from the 2016 hiring eligibility list." *Id.*

Shalabi did not respond to the letter. [61] ¶ 44. On July 22, 2022, CPD sent Shalabi correspondence stating that because he had failed to comply with the background investigation, the CPD would recommend that his "name be removed from the City of Chicago, Department of Human Resources' eligibility list for the position of Police Officer." [61] ¶ 45.

During the application and investigation process, no one from CPD discussed Shalabi's wife's accommodation requests, attendance at pro-Palestinian rallies, that Shalabi's wife had applied for a position on the TACT team, or her illness or medical leave. [61] ¶ 48. Aside from Officer Braigel, Shalabi did not discuss his wife with anyone from CPD. *Id.*

### C.    Shalabi's EEOC Charge

Shalabi filed a charge of discrimination with the EEOC on October 14, 2020, alleging that the City failed to hire him because of his religion and national origin and in retaliation for his wife's protected activities. [61] ¶ 5. The City provided a responsive position statement that acknowledged the City knew Shalabi was Palestinian-American. [71] ¶ 24. The City's response stated that Shalabi's application was still pending. *Id.*[7] The response did not state that Shalabi had failed his

---

[7] The City's response stated that Shalabi had not completed a drug screen; the parties dispute whether that was accurate. *See* [71] ¶ 26. It is undisputed that Shalabi had not completed a psychological or medical exam. *Id.*

13

background investigation or that he had not met the Background Standards. [74] ¶ 27. Shalabi received a right-to-sue letter from the EEOC on July 23, 2021. [61] ¶ 5.

### D. Comparator

Shalabi has identified AR as a comparator. [61] ¶ 61. AR had also previously applied to be a Chicago police officer and applied again in 2016. [71] ¶ 30. AR identifies as of Puerto Rican national origin; his religion is unknown. [71] ¶ 29. There is no evidence in the record of whether AR had relatives working for CPD when he applied to be a probationary police officer. *Id*. AR passed the written examination and the pre-POWER test, his application was referred to CPD during the sixth batch of applicants, and he completed his personal history questionnaire in May 2017. [71] ¶ 30.

A Kentech investigator interviewed AR in June 2017. [71] ¶ 31. The investigator identified the following red-flags from AR's background investigation: academic/disciplinary probation, law enforcement termination, sale of tobacco products to a minor, failed agency application, one speeding citation, victim of two thefts, using marijuana four times, "non-prescribed motrin use", four instances of police contact, a foreclosure, and three traffic citations. *Id*. AR's name was searched for records at local police departments; Kentech completed a "Terrorist Watch Search" for AR's name. [71] ¶ 31.[8]

---

[8] The City disputed Shalabi's assertion that AR's name was not searched on domestic or international terrorist databases because a different page of AR's Kentech report shows that it completed a "Terrorist Watch Search" on AR's name. [71] ¶ 31; *see* [62-6] at 17. Shalabi's assertion that AR's name was not searched on a terrorist watch database is unsupported by the evidence and struck.

AR admitted to smoking marijuana four times in 2010 and that he had four traffic citations. [71] ¶¶ 32–33. In his personal history questionnaire, AR stated that he had been terminated from a university police department because he brought a laptop to work that had pirated material on it while he was on probation. [71] ¶ 34. AR stated that his stepson had been using the laptop to download and watch cartoons and music and that was the source of the pirated material. [62-5] at 11. AR also admitted to taking a toy and candy from stores when he was "much younger (a child)" and downloading music from Napster when he was 8 years old. [62-8] at 3; [71] ¶ 35.

The Investigations Section completed a follow-up investigation for AR in 2018 and completed memoranda on the follow-up investigations, which were primarily about the red-flags in AR's Kentech report. [71] ¶ 36; [62-7].

## IV. Analysis

When evaluating a Title VII employment discrimination claim, a court should ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). For retaliation cases, the proscribed factor is the employee's opposition to or report of the employer's discriminatory behavior. *See* 42 U.S.C. § 2000e-3(a); *Igasaki v. Illinois Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 959 (7th Cir. 2021).

### A.     Title VII National Origin and Religion Discrimination

*Ortiz* lays out the relevant rule to determine whether a Title VII discrimination claim survives summary judgment, but plaintiffs may still organize their evidence in the *McDonnell Douglas* burden-shifting framework. *See Khungar v. Access Cmty. Healthcare Network*, 985 F.3d 565, 573 (7th Cir. 2021). Under that framework, a plaintiff makes a *prima facie* case of discrimination when he produces evidence to show that (1) he was a member of a protected class, (2) he applied for and was qualified for the position sought, (3) he was rejected for the position, and (4) the employer hired someone outside the protected group who was not better qualified than the plaintiff. *Chatman v. Bd. of Ed. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021. Once a plaintiff makes a *prima facie* case, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id*. If the employer can produce such a reason, then the plaintiff must produce evidence that the reason given is pretext, "a lie, specifically a phony reason for some action." *Id*. (internal citation omitted). The parties chose to employ the *McDonnell Douglas* framework in their briefs.

Shalabi alleges discrimination based on national origin and religion. [61] ¶ 49. It is undisputed that Shalabi is Palestinian-American and Muslim. [61] ¶1.

### 1.     Qualified for the Position Sought

The City argues that Shalabi was not qualified for the position of probationary police officer because he admitted to criminal conduct that would constitute a felony, and conduct indicating dishonesty and a lack of respect for the law. Section IV.B.6 of

the Background Standards states: "An applicant who has engaged in any conduct which would constitute a felony is not eligible for employment." [59-7] at 15. Shalabi admitted to stealing $5,000 from his employer, staging a break-in to his car, and making a false report to the police. [61] ¶¶ 20–21, 25–27, 36, 38.[9] The fact that Shalabi was not convicted of any offense is not determinative, Section IV.B.1 of the standards states: "It is the conduct itself, not the fact that the applicant was convicted, that makes the applicant unsuitable for employment." [59-7] at 14. Shalabi admitted to conduct that would constitute a felony and under the Background Standards that rendered him unqualified for the position.

Shalabi argues that the Background Standards provide that an admission is just *prima facie* evidence of the criminal conduct and that the City should have done a follow up investigation to determine if there was contradictory evidence. But Shalabi does not explain what evidence would have contradicted his admission that he took the $5,000 and lied to the police about what happened to the money. He included the mitigating facts in his narrative—he admitted to his conduct, returned the money, and he was only 19 years old at the time. [61] ¶¶ 25–27. But none of that contradicts that Shalabi engaged in conduct that would constitute a felony and that is sufficient to disqualify him from being a probationary police officer.

---

[9] In 2006, theft of property exceeding $300 and not exceeding $10,000 in value was a Class 3 felony under Illinois law. *See* 720 ILCS 5/16-1(b)(4) (West 2006). A false report that a crime has been committed while knowing that there is no reasonable ground for the report was a Class 4 felony. *See* 720 ILCS 5/26-1(a)(4), (b) (West 2003).

### 2. Comparator

Shalabi argues that CPD hired other applicants who had a criminal background; Shalabi points to comparator AR who was hired despite having red flags in his Kentech report, pleading guilty to a "quasi-criminal offense" in 2010, and being fired for having pirated material on his laptop. AR admitted to selling tobacco to a minor, [62-6] at 16, but that conduct is not a felony. *See* 720 ILCS 675/2(a) (West 2009) (sale of tobacco to a minor is a petty offense). AR was fired for having pirated material on his laptop, but AR told the investigators that his stepson had downloaded the pirated information, not him. *See* [62-6] at 21–22. AR did not admit to committing felonious conduct, and his only admitted criminal conduct was a misdemeanor, so he was not disqualified under Section IV.B.6 of the Background Standards. He is not an adequate comparator for Shalabi. *See Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709–10 (7th Cir. 2015) (no other applicant lied in interview about misdeeds, so no other applicant was an appropriate comparator).

### 3. Pretext/Consideration of Evidence

Shalabi has not made out a *prima facie* case of discrimination, but he presents argument and evidence that the City's reason for not hiring him was pretextual. My job is to consider all of the evidence in the record and determine whether a reasonable jury could determine that Shalabi was not hired because of his protected characteristics, *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), so I review the evidence of pretext and ask whether it, along with the fact that Shalabi is Palestinian-American and Muslim, provides a basis for a reasonable jury to find

that Shalabi was not hired because of his religion and national origin. Shalabi states that the City's changing reasons for not hiring Shalabi, suspicious timing of the November 2021 letter, and lack of record about the decisionmaker are evidence that the City is lying about the reason it did not hire Shalabi.[10]

Shifting justifications for an employment action may be circumstantial evidence of discrimination. *See Chaney v. Plainfield Healthcare Center*, 612 F.3d 908, 916 (7th Cir. 2010). The City has given the following reasons for its failure to hire Shalabi: Shalabi's application was still pending; CPD had preliminarily decided Shalabi was ineligible because of criminal conduct, employment history, and conduct involving drugs and driving; Shalabi's application was rejected because he failed the background investigation "because he was charged with falsifying a police report, insurance fraud, and burglary to an auto," that he attempted to commit insurance fraud by stealing $5,000 from his employer, staging a break-in to his car, and making a false report to the police, and he had numerous traffic citations; and Shalabi was not hired because he was preliminarily rejected for failing the background check and ultimately rejected for failure to comply with the November 2021 letter. *See* [71] ¶¶ 26, 28; [61] ¶ 43; [58] at 15.[11]

---

[10] Shalabi's argument that the City relied on "rebuttable" evidence to find that Shalabi was not eligible for employment is the same as his argument that he was qualified for the position, so I do not address it separately here. Similarly, because I found that the City's background investigation did not show that AR had engaged in conduct which would be a felony, I do not address Shalabi's argument that the City enforced its hiring standards in a discriminatory manner.

[11] The EEOC position statement stated that Shalabi had not completed a drug screen and Shalabi says that he did; accepting Shalabi's statement as true, he does not contest that he had not completed the psychological or medical exam, which were part of the application

These statements do not shift between reasons, instead they build on one another—at first Shalabi's application was pending, then the City had made a preliminary determination that Shalabi failed to meet the Background Standards, and finally Shalabi did not respond to the 2021 letter notifying him of the preliminary determination and asking if he wanted to continue with his application. The City's reasons are not internally inconsistent nor was there a wholesale change between the reasons given as would evidence discrimination. *See Chaney*, 612 F.3d at 916 (decisionmaker had resolved to fire plaintiff before investigating, procedures were different than normal, reason given to plaintiff was different than reasoning during litigation); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723–24 (7th Cir. 2005) (nothing that decisionmaker gave different reasons for his decision to different parties).

Shalabi says that the City's argument that he was not hired for "failure to comply" with the November 2021 letter is false because the letter gave the recipient the option of not responding, in which case their application would be deemed voluntarily withdrawn. I agree that not responding to the letter was an option, *see* [61] ¶ 43, so Shalabi technically complied with the requirements of the letter. But as a matter of causation, Shalabi's failure to respond meant that he withdrew his application from consideration, which in turn prevented the City from doing a follow up investigation or hiring him. [61] ¶¶ 43–44. The City is not lying when it says that

---

process. [71] ¶ 26. The fact that Shalabi had not finished the application process is undisputed.

Shalabi's application was ultimately rejected because he did not follow up on the November 2021 letter.

Shalabi argues the timing of the letter is suspicious because he had not heard anything about his application since 2019 and then received the letter two weeks after he filed this suit. Shalabi also points out that there is no written record of who made the decision that he was ineligible, when it was made, or what steps were taken before making it. The lack of paperwork doesn't look good for the City. But the suspicious timing and lack of paperwork are the only evidence Shalabi offers that something was amiss and they do not support an inference that the City did not truly believe that Shalabi was ineligible under the Background Standards. *See Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012).

Considering all of the evidence together in a light favorable to Shalabi, there is not sufficient evidence in the record for a jury to find that the City failed to hire Shalabi because he is Palestinian-American or Muslim. Summary judgment for the City is appropriate on Shalabi's Title VII discrimination claims.

**B.      Title VII Retaliation**

Title VII protects an employee who has acted to oppose an unlawful employment practice from retaliation by his employer. *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Retaliation requires a plaintiff to show that "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Id*. Shalabi's retaliation claim is that he was not hired as a police

21

officer because his wife requested accommodations as a Chicago Police Officer, her requests were met with resistance, and she was harassed after receiving the accommodations. [61] ¶ 49. A plaintiff may bring a "third-party" retaliation claim if they can show that an adverse action against them would persuade a reasonable worker from pursuing their own protected action. *See Lesiv*, 39 F.4th at 916–17; *see also Thompson v. North American Stainless, LP*, 562 U.S. 170, 174–75 (2011).

But Shalabi must still show that he was not hired because the City intended to retaliate against Nanlawala, i.e., that Nanlawala's protected activity was the "but-for" cause of Shalabi's rejection. *Lesiv*, 39 F.4th at 918. As with Shalabi's discrimination claim, the undisputed fact that Shalabi admitted to disqualifying conduct under the Background Standards means that Shalabi cannot show that but-for Nanlawala's activity he would have been hired. In other words, in a world where Nanlawala did not make requests for the City to allow her to have a safe space to pump or accommodations while she was pregnant, the undisputed evidence in the record is that Shalabi's past conduct still rendered him ineligible for the position.

Shalabi argues that the overlapping timelines between Nanlawala's requests and the City taking so long to decide Shalabi's application is proof that the City was retaliating against Nanlawala. But "mere temporal proximity between [the protected activity] and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Summary judgment is appropriate for the City on Shalabi's Title VII retaliation claim.

22

## V.    Conclusion

Shalabi's motion to strike, [73], is granted in part, denied in part. The City's motion for summary judgment, [57], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

_____

Manish S. Shah
United States District Judge

Date: March 28, 2024